741 A.2d 686

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Samuel CARSON, Appellant.**

Supreme Court of Pennsylvania.

Argued May 1, 1997.

Decided Nov. 18, 1999.

466

468

Jack McMahon, Philadelphia, for S. Carson.

Catherine Marshall, Lawrence J. Goode, Philadelphia, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

ZAPPALA, Justice.

This is a direct appeal pursuant to 42 Pa.C.S. §§ 722(4) and 9711(h). Appellant, Samuel Carson, was convicted by a jury of murder in the first degree, robbery, two counts of aggravated assault, criminal conspiracy and possession of an instrument of crime. At the conclusion of the penalty phase of Appellant's trial, the jury found the existence of four aggravating circumstances and no mitigating circumstances, and returned a sentence of death.

The evidence of record, viewed in the light most favorable to the Commonwealth as verdict winner, discloses the following. Appellant was a drug dealer, conducting on-going crack cocaine sales in the area of 21st and Clymer Streets in South Philadelphia. On the evening of November 21, 1993, Appellant and two accomplices, Lawrence Eddins and Anthony Johnson, met at a bar where they agreed to rob the residence of Penny Hairston, who they believed was selling drugs in direct competition with Appellant. The men went to Hairston's residence at 2117 Clymer Street and gained entry by claiming that they wished to discuss the establishment of a drug selling operation at the residence. While Appellant was in the kitchen discussing this arrangement with Hairston, Eddins and Johnson threatened another drug dealer who was present, Edgar Clarke. Appellant, Eddins and Johnson then left the residence.

Clarke, having been threatened by the men, contacted a friend of his, Ramon Burton, and requested that Burton come to the scene. Immediately thereafter, Appellant, Eddins and Johnson re-entered Hairston's residence and robbed Clarke of drugs and money. When the men exited the residence, they

encountered Burton, who had since proceeded to 2117 Clymer Street in a gray Honda, and a gun battle ensued. Remarkably, the only injury was to Eddins, who suffered several nonfatal gunshot wounds.

Immediately following the gun battle, Appellant fled towards 21st and St. Albans Streets. Once on St. Albans Street, Appellant fired several shots at William Lloyd, an innocent bystander who was standing on the southwest corner of 21st and Clymer Streets. Lloyd died as a result of multiple gunshot wounds to the head.

The police recovered seven spent .22 caliber shell casings in front of 2117 Clymer Street and five spent 9 millimeter casings in the vicinity of where the gray Honda had been during the gun battle. The police also recovered the 9 millimeter handgun fired by Burton. On January 8, 1994, while executing an arrest warrant for Appellant at his residence at 2009 Catherine Street, the police recovered a .38 caliber handgun from Appellant when he attempted to covertly discard the weapon from his second story bedroom window as the police were attempting to execute the arrest warrant.

Prior to trial, Appellant moved to sever his trial from that of Johnson and Eddins. On December 13, 1994, the motion was granted.

During the guilt phase of Appellant's trial, the Commonwealth sought to establish the existence of a conspiracy to rob the 2117 Clymer Street residence through the testimony of Monique Willey. Willey testified that she was with Appellant, Johnson and Eddins at Victor's Tavern on the night of the murder, and that Johnson had requested her assistance in the trios' planned robbery of 2117 Clymer Street.

The Commonwealth presented the eyewitness testimony of Clarke and Burton, both of whom had identified Appellant from a photo array and line-up as the perpetrator of the crimes. The Commonwealth also presented the eyewitness testimony of Ruth Beverly. Beverly had been walking north on 21st Street and crossing at St. Albans Street when she heard the gun battle erupt on Clymer Street. Beverly was

startled by the gunfire and stumbled to the ground while attempting to take cover. Beverly testified that as she picked herself up off of the ground, she observed Appellant walk into the middle of St. Albans Street and shoot the victim as he stood at the corner of 21st and Clymer Streets.

The Commonwealth presented evidence of the ballistics testing conducted on the 9 millimeter handgun, the .38 caliber handgun, the .22 caliber and 9 millimeter shell casings recovered from Clymer Street and the bullet fragments removed from the gray Honda and the victim's brain. Through expert testimony it was established that the .22 caliber shell casings had all been fired from the same weapon and that the shell casings were consistent with the bullet fragments removed from both the gray Honda and the victim's brain. The Commonwealth further established through expert testimony that the .38 caliber handgun recovered from Appellant was capable of firing .22 caliber ammunition.

Appellant testified on his own behalf and presented an alibi defense, claiming to have been at home with his father and girlfriend at the time of the murder. Appellant attempted to discredit the testimony of Commonwealth eyewitness Beverly by claiming that she was motivated to testify falsely against Appellant as retribution for Appellant having broken off a prior long-standing relationship between the two, in which Beverly had been providing Appellant with sexual favors in exchange for crack cocaine. Appellant attempted to bolster his alibi defense by presenting the testimony of his father and girlfriend, both of whom testified that Appellant was at home when the gunfire erupted on nearby Clymer Street.

On July 14, 1995, at the conclusion of an eight day jury trial, Appellant was convicted on the charges of murder in the first degree, robbery, two counts of aggravated assault, criminal conspiracy and possession of an instrument of crime. On July 18, 1995, Appellant was sentenced to death for the murder conviction. The jury found the existence of four aggravating circumstances: the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); in the commission of the offense the defendant knowingly created a

grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); the defendant has a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and the defendant committed the killing while in the perpetration of a drug felony, 42 Pa.C.S. § 9711(d)(13). No mitigating circumstances were found.[1] On March 28, 1996, Appellant was sentenced to terms of imprisonment on each of the remaining charges to run concurrent with his sentence for first degree murder.

On July 19, 1995, post-sentence motions were filed on Appellant's behalf by trial counsel, Daniel Greene, Esquire. On April 25, 1996, additional post-sentence motions were filed on Appellant's behalf by Jack McMahon, Esquire, whom Appellant had since retained to represent him on appeal. By order dated August 6, 1996, the trial court denied the post-sentence motions filed by Greene, which had not been pursued by McMahon, but which had not previously been formally denied. The remaining post-sentence motions were denied by order of the trial court that same date.

We will first address Appellant's contention that the evidence was insufficient to support his conviction for first degree murder. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to support all the elements of the crime beyond a reasonable doubt. *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986). In order to prove murder in the first degree, the Commonwealth must show that a human being was unlawfully killed, that the accused committed the killing and that the killing was done in an intentional, deliberate and premeditated manner. 18 Pa.C.S. § 2502(a); *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). The element

---

1. The defense argued the existence of three mitigating circumstances to the jury: the defendant has no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); the age of the defendant at the time of the crimes, 42 Pa.C.S. § 9711(e)(4); and any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8).

which distinguishes first degree murder from all other degrees of criminal homicide is the presence of a willful, premeditated and deliberate attempt to kill. *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439 (1995).

Appellant specifically alleges that the evidence was insufficient to support the verdict of first degree murder because the testimony of Beverly, the only eyewitness to the murder, was incredible. As credibility determinations are within the sole province of the trier of fact, who is free to believe all, part or none of the evidence, Appellant's claim provides no basis for relief. *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716 (1992); *see also Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981) (holding that issues of credibility, solely within the province of the trier of fact, will not be reviewed on appeal). Moreover, after reviewing the record, we find that the testimony of Commonwealth witnesses Clarke, Burton and Beverly, coupled with the corroborating testimony and physical evidence, was clearly sufficient to support Appellant's conviction for first degree murder.

In his first claim of pre-trial error, Appellant raises a *Batson*[2] issue of sorts. The victim in this case was black, as is Appellant. During jury selection, two jurors, both black, had been seated when Appellant used his first peremptory challenge against a white male. When Appellant attempted to use his second peremptory challenge against a white female the trial court *sua sponte* asked counsel for Appellant to place on the record his race-neutral reason for the challenge. Counsel explained that after consulting with Appellant and explaining to him the law with respect to race and gender vis a vis peremptory challenges, Appellant indicated that there was something about the juror's face that made him feel that she was not trustworthy. The trial court rejected this proffered reason as pretextual and ordered the juror seated.

2. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment precludes the exercise of racially discriminatory peremptory challenges by a prosecutor in a criminal trial.

Appellant argues to this Court that: (1) the trial court erred in *sua sponte* raising the issue of the discriminatory use of peremptory challenges by the defense; (2) at the time the issue was raised there had been no pattern of prejudice establishing prima facie discrimination and warranting explanation for the use of peremptories; and (3) placing the juror on the panel was not the appropriate remedy.

The Commonwealth counters that

the very rationale of *Batson* suggests that trial courts not only may make *sua sponte* inquiries into peremptory challenges which appear to be racially discriminatory, but are in fact duty bound to do so. A critical rationale for forbidding parties to exclude jurors based on their race is the right of all individual citizens not to be deprived of their right to sit on a jury because of racial concerns or prejudices. It follows that a trial court has a duty not to sit by and watch the constitution being violated. Any other rule would require the court, and by extension the state, to become complicit in racial discrimination. This is forbidden. By not acting when it perceived racial discrimination, the court would condone a violation of the equal protection clause.

Brief for Appellee at 22–23 (citations omitted). A review of *Batson* and its progeny arguably supports the Commonwealth's position.

In *Batson,* the United States Supreme Court identified the factors necessary to establish a prima facie case of purposeful discrimination:

[A] defendant first must show that he is of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the

veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

476 U.S. at 96, 106 S.Ct. 1712 (citations omitted). The Court went on to state that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* at 87, 106 S.Ct. 1712.

The Court subsequently extended the *Batson* rationale in a variety of contexts. In *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court held that a criminal defendant could challenge, on equal protection grounds, the race-based use of peremptory challenges whether or not the defendant and the excluded juror shared the same race. The Court reached this determination by holding that a criminal defendant has third party standing to challenge the denial of equal protection to jurors excluded by the prosecution because of their race. This holding was based on three factors. First, the criminal defendant has a legitimate interest in challenging the practice of discriminatory use of peremptory challenges because racial discrimination in jury selection casts doubt on the integrity of the judicial process, placing the fairness of the criminal proceeding in doubt. *Powers,* 499 U.S. at 411, 111 S.Ct. 1364. Second, both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom. *Id.* Third, it is unlikely that a juror dismissed because of race will possess sufficient incentive to set in motion the arduous process needed to vindicate his rights. *Id.* at 414–415, 111 S.Ct. 1364.

The Court further extended the *Batson* rationale in *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), holding that a criminal defendant, like the prosecution, is prohibited from engaging in purposeful racial discrimination in the use of peremptory challenges. In *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d

660 (1991), the Court extended the *Batson* rationale beyond the criminal context, holding that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of race. Most recently, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Court held that peremptory challenges on the basis of gender are also forbidden by the Equal Protection Clause. *But cf. Minnesota v. Davis*, 504 N.W.2d 767 (Minn.1993) (refusing to extend *Batson* to peremptory challenges on the basis of religion), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (Ginsburg, J., concurring; Thomas, J., dissenting, joined by Scalia, J.).

The Court has not addressed the question of whether a trial court, after identifying a prima facie case of discriminatory use of peremptory challenges, can *sua sponte* raise the issue.[3] However, the Court's extensions of the *Batson* rationale, and the reasons given therefore, can be construed as supporting the Commonwealth's position that the trial court is duty bound to make a *sua sponte* inquiry after observing a prima facie case of purposeful discrimination by way of peremptory challenges.

The Court's extensions of the *Batson* rationale were specifically based on the need to retain the integrity of the judicial process by eliminating discrimination from the courtroom. The Court found the goal of eliminating racial discrimination from the courtroom so compelling that it adopted a novel approach to the concept of third party standing, taking the unprecedented step of allowing the defense and the prosecu-

3. The Commonwealth, like the trial court below, *see* Trial Ct. op. at 4–5, characterizes this Court's decision in *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996), as an implicit recognition of the principle that a trial court may raise a *Batson* issue on its own initiative. In *Johnson*, the trial court *sua sponte* asked the Commonwealth mid-trial to explain its use of peremptory strikes, ultimately ruling that the Commonwealth's reasons were racially neutral. This Court could not fully review the merits of the appellant's subsequent claim, that the trial court erred in ruling that the Commonwealth's reasons were race-neutral, because the appellant had failed to provide a complete record for appellate review.

tion to raise the issue on behalf of jurors.[4] Furthermore, dictum appearing in *Batson* and its progeny suggests the existence of an affirmative trial court duty to prevent the discriminatory use of peremptory challenges.[5] Notwithstanding such rationale, Appellant argues that when the trial court *sua sponte* raised the issue, it violated the fundamental principle of judicial impartiality that a court should confine its consideration to issues presented by the parties.

Agreeing with Appellant's position that the trial court committed reversible error by *sua sponte* raising the issue would be tantamount to holding that where a trial court observes a prima facie case of discriminatory use of peremptory challenges it must sit by and silently watch. Such a holding would be inconsistent with the rationale set forth in *Batson* and its progeny, protecting both the excluded juror and criminal defendant from discrimination in the courtroom. However, to hold to the contrary and allow the trial court to raise the issue *sua sponte* could be characterized as following *Batson* "logical-

---

**4.** *See Powers*, 499 U.S. at 417–431, 111 S.Ct. 1364 (Scalia, J., dissenting).

**5.** "By requiring trial courts to be sensitive to racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice." *Batson*, 476 U.S. at 99, 106 S.Ct. 1712.

"Without the direct and indispensable participation of the judge . . . the peremptory challenge system would serve no purpose. By enforcing a discriminatory peremptory challenge, the court 'has not only made itself a party to the [biased act], but has elected to place its power and prestige behind the [alleged] discrimination.' *Burton v. Wilmington Parking Authority*, 365 U.S. at 725 [81 S.Ct. 856, 6 L.Ed.2d 45 (1061)]." *Edmonson*, 500 U.S. at 624, 111 S.Ct. 2077.

"The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system. . . . The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition." *Powers*, 499 U.S. at 415–416, 111 S.Ct. 1364 (citations omitted).

" 'Be it at the hands of the State or the defense,' if a court allows jurors to be excluded because of group bias, '[it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.' *State v. Alvarado*, 221 N.J.Super. 324, 328, 534 A.2d 440, 442 (1987)." *Georgia v. McCollum*, 505 U.S. at 49–50, 112 S.Ct. 2348.

478

ly to its illogical conclusion." *Georgia v. McCollum*, 505 U.S. at 49, 112 S.Ct. 2348 (Scalia, J., dissenting).[6]

In addressing Appellant's claim, we decline to step into the morass of "peremptory challenge jurisprudence" created by the United States Supreme Court. For even if we were to accept Appellant's contention that the trial court erred in raising the issue *sua sponte*, we must nevertheless agree with the Commonwealth that Appellant suffered no prejudice.

The trial court's remedy for the violation it perceived, i.e., seating the juror, while vindicating the *Batson* rationale of protecting the excluded juror from racial discrimination in the courtroom, is argued by Appellant as having adversely affected his trial. We cannot agree.

After inquiring into Appellant's reasons for using his peremptories, the trial court rejected Appellant's proffered reasons as pretextual and ordered the juror seated. "A finding by the trial court as to discriminatory intent must be given great deference on appeal." *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996); *see also Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308 (1995) (lower court's credibility assessment of supposed race-neutral reasons may not be disturbed on appeal absent a showing of compelling reasons); *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (evaluation of party's state of mind in selecting jurors lies "peculiarly within a trial judge's province"). Furthermore, the seating of an improperly struck juror is an appropriate remedy under these circum-

6. If *Batson* and its progeny have indeed created an affirmative duty on the part of the trial court to *sua sponte* raise the issue of the discriminatory use of peremptory challenges when the trial court observes a prima facie case of purposeful discrimination, we can only speculate as to the untoward effect such a duty would have on the entire *voir dire* process. For if the trial court is duty bound to *sua sponte* raise *Batson* type objections on behalf of jurors, the failure of the trial court to do so when confronted with a prima facie case would constitute an abuse of discretion. One shudders to think of the all encompassing record that would have to be developed at *voir dire* in order to facilitate appellate review, given the variety of circumstances which the rationale of *Batson* has been applied to.

stances. *Commonwealth v. Garrett,* 456 Pa.Super. 60, 689 A.2d 912 (affirming trial court's reinstatement of juror improperly struck by defense for racial reasons), *alloc. denied,* 549 Pa. 712, 701 A.2d 575 (1997).

Appellant nevertheless asserts that the trial court's seating of the juror infringed on his "right to select those people who he believed would grant him a fair trial." Brief for Appellant at 10. The Sixth Amendment to the United States Constitution, ensuring the right of a criminal defendant to an impartial jury of his peers, guarantees the right of the criminal defendant to a jury pool drawn from a fair cross section of the community. *E.g., Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). It does not guarantee a criminal defendant the jury of his choice or of any particular composition. *Id.*

Appellant has made no showing that this particular juror was biased or incompetent in any way to serve as a juror. As Appellant suffered no prejudice as a result of the trial court seating the juror, he is entitled to no relief.

Appellant's remaining two claims of pre-trial error challenge the effectiveness of trial counsel. Because Appellant failed to raise these ineffectiveness of trial counsel claims in post-trial motions when he was represented by appellate counsel, both claims have technically been waived. A claim of ineffectiveness of trial counsel must be raised at the earliest stage in the proceedings at which allegedly ineffective counsel is no longer representing the defendant. *Commonwealth v. Griffin,* 537 Pa. 447, 644 A.2d 1167 (1994). Nonetheless, we will consider Appellant's claims under the relaxed waiver rule applicable to direct capital appeals. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 955 n. 19 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

The standard of review for ineffective assistance of counsel claims is well established. Counsel is presumed effective and the burden of proving ineffectiveness rests with the defendant. *Commonwealth v. Floyd,* 506 Pa. 85, 484 A.2d 365 (1984). In order for Appellant to prevail on a claim of

ineffectiveness he must demonstrate that: (1) the underlying claim is of arguable merit; (2) the particular course chosen by counsel did not have some reasonable basis designed to effectuate his interests; and (3) counsel's ineffectiveness prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Additionally, counsel will not be deemed ineffective for failing to assert a baseless claim. *Commonwealth v. Giknis*, 491 Pa. 215, 420 A.2d 419 (1980).

Appellant first claims that trial counsel was ineffective for failing to file a motion to suppress the pre-trial identifications made by Commonwealth witnesses Clarke, Burton and Beverly, through a photo array. Whether an out-of-court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Commonwealth v. Sutton*, 496 Pa. 91, 436 A.2d 167 (1981). A pre-trial identification will not be suppressed as violative of due process unless the facts demonstrate that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Appellant asserts that the photo array from which each witness identified Appellant was unduly suggestive because

> there were at least nine photographs in the array with three of the pictures representing the suspects in the case. The police used all three [suspects] in the photo spread that was shown to the witnesses, instead of utilizing three separate photo arrays. This was unduly suggestive as it was implied to the witnesses that viewed the array that there was more than one suspect within the array.

Brief for Appellant at 14 (citation omitted).

The logic of Appellant's unelaborated claim is not apparent. Appellant fails to explain how the array "implied" there was "more than one suspect," or how the supposed implication was

suggestive. Under the totality of the circumstances disclosed by the record before us, we discern no legitimate basis for counsel to have filed a motion to suppress the pre-trial identifications as violative of due process. Counsel was not ineffective for failing to assert this baseless claim.

 Appellant next claims that trial counsel was ineffective for failing to demand individual *voir dire* about opinions of drug use and race.[7] This claim is meritless. As previously succinctly stated by this Court:

> [T]he examination of jurors under *voir dire* is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury.... Neither counsel ... should be permitted to ... ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case.

*Commonwealth v. Johnson,* 452 Pa. 130, 305 A.2d 5, 7 (1973); *accord Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439 (1995). Appellant's complaint that trial counsel should have used *voir dire* to gauge the efficacy of potential defense strategies provides no basis for an ineffectiveness claim.

Turning to Appellant's claims of trial error, Appellant first asserts three instances of ineffectiveness of trial counsel. Although these three ineffectiveness of trial counsel claims have also been technically waived for failing to assert them in post-trial motions when Appellant was represented by appellate counsel, we will nevertheless consider them under the relaxed waiver rule applicable to direct capital appeals. *Zettlemoyer.*

7. Although Appellant frames this issue as an ineffective assistance of trial counsel claim, the record reveals that trial counsel did request at *voir dire* that the trial court ask each prospective juror individually whether learning that Appellant was involved in selling drugs would adversely affect their opinions of him. N.T. 7/5/95 at 8. The trial court denied the request, intimating that it might consider Appellant's request with the next panel; however, trial counsel did not renew the request when *voir dire* of the second panel began. *Id.*

482

Appellant first claims that trial counsel was ineffective for the manner in which he made his opening statement.[8] During the course of the presentation of the opening statement for the defense, the Commonwealth objected on the basis that counsel was improperly informing the jury in precise detail about what each witness would say when called to testify, instead of providing an outline of the testimony that the jury would hear. The trial court sustained the Commonwealth's objection and ordered counsel to curtail his opening statement accordingly. Notwithstanding the court's ruling, counsel continued his opening statement in the same vein and complained to the jury that the trial court was improperly restricting the scope of his statement. The trial court was forced to admonish counsel three separate times for failing to adhere to and disparaging the court's prior rulings, ultimately ordering that the defense call its first witness. At that point, counsel moved for a mistrial on the basis that the trial court was not permitting him to try his case. The trial court denied the motion for mistrial, but again gave counsel the option of continuing, conditioned on counsel's compliance with the court's previous instructions. Counsel accepted the trial court's offer to continue, but again ran afoul of the court's instructions:

MR. GREENE [trial counsel]: Members of the jury, I will call to the witness stand in this case for the defense the father of [Appellant] and his lady friend, Miss Johnson, both of whom will testify that [Appellant] was at his home at 2009 Catherine Street at the time these gunshot [sic] were fired in the vicinity of 21st and Clymer Street.

They will testify to the way they were in the house, how [Appellant] came into the house and what they heard. The soul of our defense will be shown through these two witnesses and also through [Appellant] himself that he was not present on Clymer Street in the 2100 block, at the intersection of 21st and Clymer Street when the first shots

8. Appellant raised a variation of this claim in post-trial motions, asserting that "the Trial Court erred in interrupting [trial counsel] at several points during his opening address, and eventually ordering him to cease his opening statement and call his first witness." Trial Ct. op. at 6.

were fired and in the relatively short period of time thereafter when the second shots were fired.

That being so, the fact that he was not there, we will ask you to find him not guilty, in that he was not involved in any manner, way, shape or form with the incident that occurred out there on that particular evening.

We will also call possibly one more witness, since I am not sure whether this witness will appear in this courtroom, although I made an attempt to get him, so I will not at this time give you an outline of what he will testify to. I can't be sure that he will be present.

I have spoken to you this afternoon a lot differently than I wanted to speak to you, but I must obey the dictates of his honor.

THE COURT: Mr. Greene, maybe I don't speak [E]nglish. I just got done telling you not to criticize the court in front to the jury and not to refer to what you would like to tell them and you can't tell them.

All right. Please be seated. Call your first witness. I will not tolerate this conduct any further.

I just got done telling you it was an improper statement to the jury to tell them that you want to tell them something but the judge wouldn't let you. Call your first witness.

N.T. 7/11/95 at 103–104.

 Appellant's underlying ineffectiveness claim has arguable merit. The purpose of an opening statement is to apprise the jury of the background of the case, how the case will develop and what counsel will attempt to prove. *Commonwealth v. Montgomery*, 533 Pa. 491, 626 A.2d 109 (1993). Counsel's repeated disregard for the trial court's rulings during the presentation of the opening statement cannot be said to have had a reasonable basis designed to effectuate Appellant's interests in this regard. However, since Appellant suffered no prejudice as a result of counsel's presentation of the opening statement, his ineffectiveness claim fails.

Appellant contends that he was prejudiced as a result of trial counsel's inept presentation of the opening statement

because the jury was not apprised as to how the case was to develop or what the defense was attempting to prove. We disagree. The text of counsel's final attempt to comply with the trial court's instructions regarding the opening statement (*see supra*), refutes Appellant's assertion of prejudice, as counsel did in fact convey to the jury the basis of Appellant's defense before running afoul of the trial court's instructions. Counsel told the jury of the background of the case, that Appellant would be testifying on his own behalf and presenting an alibi defense and that defense witnesses would be called to establish that Appellant was elsewhere when the shootings occurred. Counsel's presentation of the opening statement did not result in prejudice to Appellant.

 Appellant next claims that trial counsel was ineffective for failing to properly advise Appellant of his right not to testify on his own behalf. The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. *Commonwealth v. Bazabe,* 404 Pa.Super. 408, 590 A.2d 1298, *alloc. denied,* 528 Pa. 635, 598 A.2d 992 (1991); *Commonwealth v. Fowler,* 362 Pa.Super. 81, 523 A.2d 784, *alloc. denied,* 517 Pa. 598, 535 A.2d 1056 (1987); *see Commonwealth v. Rawles,* 501 Pa. 514, 462 A.2d 619, 624 n. 4 (1983). In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf. *Id.* Appellant's claim does not satisfy either requirement.

Appellant asserts that trial counsel failed to apprise him of his right not to take the stand or discuss Appellant's testimony in relation to his defense. According to Appellant,

the trial transcript is full of references that defense counsel never spoke with [Appellant] about his testimony. On cross[-]examination, [Appellant] testified as follows:

Q: You didn't talk to your lawyer at all?

A: No, I did not.

Q: Mr. Greene [trial counsel] asked you a lot of questions and he had no idea what your answers were going to be?

A: No.

Q: Didn't you find it quite odd that Mr. Greene knew exactly what to ask you?

A: He asked me questions about the incident.

Q: You told him everything about the [sic] previously, is that right?

A: No I did not.

Q: Why not?

A: Why would I?

Brief for Appellant at 20–21.

However, in presenting this argument, Appellant has misquoted the record and taken it out of context. The defense attempted to establish through direct examination of appellant that Commonwealth witness Beverly was motivated to testify falsely against Appellant. On cross-examination, the Commonwealth attempted to suggest that Appellant's testimony in this regard was fabricated and had been rehearsed. Examining the testimony in context by including questions and answers that precede, supplement and follow the portion of the trial transcript misquoted above (which appear in bold type for purpose of comparison), the actual trial transcript reads as follows:

**By Mr. Desidero [prosecutor]:**

Q: **You are a reasonably intelligent person. Did you talk to your lawyer about this, what you were going to say before you took the stand?**

A: **No. The reason that I had talked to my lawyer is he's not charged with murder. I am.**

Q: You didn't talk to your lawyer at all?

A: **What you mean by talking to him? Of course we talked.**

Q: **You didn't tell him what you were going to say?**

A: No, I did not.

Q: **No?**

A: **No, I did not.**

Q: Mr. Greene [trial counsel] asked you a lot of questions and he had no idea what your answers were going to be?

A: No.

Q: Didn't you find it quite odd that Mr. Greene knew exactly what to ask you then?

A: **I don't understand the question.**

Q: **Yes. Did it strike you as odd that Mr. Greene knew exactly what questions to ask you, to get the testimony that you wanted to give?**

A: He asked me questions about the incident.

Q: You told him everything previously, is that right?

A: No, I did not.

Q: Why not?

A: Why would I?

Q: **I am asking you, why didn't you?**

A: **I answered it. I answered your question to the best of my ability.**

Q: **Yes. But I am asking you, why didn't you discuss what you were going to say with your lawyer?**

A: **Why would I discuss what I am going to say?**

Q: **Doesn't he represent you for murder?**

A: **Yes.**

Q: **Your life is on the line?**

A: **Yes.**

Q: **You didn't discuss this with the man who is representing you in this case?**

A: No.

Q: **Sir, do you want to re-think that answer?**

A: **I answered it.**

Q: **My next question is, sir, did it strike you as odd that Mr. Greene knew exactly what questions to ask you?**

A: That's the same question.

Q: I know. Did it strike you as being odd that he knew exactly what questions to ask you?

A: I don't understand how you could say he knew what questions to ask me. How would he know what questions to ask me?

The Court: You are getting into argument now.

By Mr. Desidero:

Q: Did he ask you everything that you would want to have been asked?

A: What you mean?

Q: About what happened in this case?

A: No, he did not. He just asked me, is this true what happened? And I said no.

N.T. 6/11/95 at 136–139.[9]

When read in context, it is clear that Appellant's responses that he had not talked with his lawyer were made in an attempt to refute the Commonwealth's obvious insinuations that Appellant's testimony was false and that it had been rehearsed with trial counsel. We must agree with the Commonwealth, that "[a]s is clear from the testimony [Appellant] carefully left out, he acknowledged that he *had* spoken to his lawyer about the case. The only thing he denied was discussing with counsel *what* he was going to say on the stand." Brief for Appellee at 39 (emphasis in original). The Commonwealth's cross-examination of Appellant regarding whether he ever discussed his testimony with trial counsel does not establish that trial counsel failed to advise Appellant of his right not to testify, and Appellant fails to offer any other support for this claim.

9. In its brief to this Court, the Commonwealth characterizes the misquoting of the trial transcript without "providing even an ellipse to indicate the omission" as "misleading," Brief for Appellee at 39, and "disingenuous." *Id.* at 43 n. 14. Because we too are troubled by the omission, which could implicate Rule 3.3 of the Rules of Professional Conduct, Candor Toward the Tribunal, this matter is being referred to the Disciplinary Board.

Moreover, it cannot be said that the decision to have Appellant take the stand did not have some reasonable basis designed to effectuate Appellant's interests. Appellant's defense was that of alibi and Appellant's testimony concerning his whereabouts at the time of the murder corroborated the testimony of his father and girlfriend regarding Appellant's whereabouts. More importantly, Appellant's testimony was vital to the defense's attempt to discredit the testimony of Commonwealth witness Beverly. Appellant is due no relief on this claim.

Appellant next contends in a related claim that trial counsel was ineffective for failing to object to the Commonwealth's cross-examination of Appellant regarding whether he ever discussed his testimony with trial counsel (*see, supra*). Appellant claims that the Commonwealth's line of questioning violated the attorney-client privilege, which provides:

> In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5916.

The Commonwealth, citing *Commonwealth v. Sims,* 513 Pa. 366, 521 A.2d 391 (1987), counters that the attorney-client privilege protects only confidential communications, i.e., the substance of communications by a client to his attorney, not the fact that communications took place. The Commonwealth contends that since Appellant was not asked to disclose, nor did he disclose, the substance of any confidential communications, the privilege does not therefore apply.

Although we do not find direct support for the Commonwealth's argument in our *Sims* decision, we are nevertheless inclined to agree. The prosecutor did not request that Appellant reveal the substance of any confidential communications between Appellant and his attorney, but instead simply asked if a conversation had taken place. Furthermore, even assuming *arguendo* that the prosecutor's line of questioning did

implicate the attorney-client privilege, Appellant fails to establish how he was prejudiced by the testimony at issue. Accordingly, his ineffectiveness claim must fail.

In his next claim of trial error, Appellant asserts that the trial court abused its discretion in denying Appellant's motion for a mistrial on the basis that one or more jurors might have seen him in handcuffs outside the courtroom. On the second day of trial, immediately following a lunch recess, trial counsel informed the court that Appellant had told him that two jurors observed Appellant as he was brought into the courtroom. At this time, counsel made no mention of handcuffs or law enforcement officers; counsel merely requested that the court ensure that such an incident did not reoccur. When trial resumed the next day, counsel moved for a mistrial asserting that, "one, possibly two of the jurors in this case have observed my client in handcuffs out in the hall." N.T. 7/11/95 at 2. The court denied counsel's request for a mistrial and offered to give a cautionary instruction.

The trial court concluded that any prejudice resulting from such a limited, unintentional alleged exposure was not sufficient to mandate a mistrial. We agree. "Clearly, the mere *possibility* that some of the jurors *might* have seen appellant briefly in the hallway in handcuffs is not grounds for a mistrial, as a brief viewing of a defendant in handcuffs is not so inherently prejudicial as to strip defendant of the presumption of innocence." *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 501 (1988) (emphasis in original); *see also Commonwealth v. Evans*, 465 Pa. 12, 348 A.2d 92 (1975). Further, any conceivable prejudice was cured by the following cautionary instruction given by the trial court:

It is a fundamental principle of our system of criminal law that the defendant is presumed to be innocent. The mere fact that he was arrested and is accused of a crime is not any evidence against him.

Furthermore, the defendant is presumed innocent throughout the trial, unless and until you conclude based on careful

and impartial consideration of the evidence that the prosecution has proven him guilty beyond a reasonable doubt. The fact that someone is arrested and accused of a crime or even the fact that he might be held in custody, that is not any evidence against him and you should not draw any conclusion from those facts.

N.T. 7/13/95 at 4. This instruction effectively conveyed to the jury that whether the defendant is in the custody of law enforcement officials is irrelevant to the determination of guilt or innocence, without drawing attention to any particular incident or to handcuffs in general. The trial court did not abuse its discretion in denying Appellant's mistrial request.

 Appellant next claims that he was denied a fair trial when the trial court prevented trial counsel from fully examining Commonwealth witness Sergeant Nicholas Frisco.[10] On direct-examination, Sergeant Frisco testified that he and his partner were in a patrol car proceeding down 21st Street toward Fitzwater Street, when gunfire erupted on nearby Clymer Street. When the officers arrived on Clymer Street, they found Lawrence Eddins lying wounded on the ground. While Sergeant Frisco's partner attended to the injured Eddins, Sergeant Frisco heard five to ten more gun shots while simultaneously observing the victim fall to the ground on the corner of 21st and Clymer Streets. N.T. 7/11/95 at 15–17. On cross-examination, trial counsel repeatedly questioned Sergeant Frisco about whether he first heard gun fire before or after passing Fitzwater Street, and what rate of speed he was driving. *Id.* at 18–21. After sustaining several Commonwealth objections to various questions on the basis of relevance, the trial court called a conference at sidebar and asked trial counsel to put an offer of proof on the record. Trial counsel responded that timing and distance were very important to his case. When asked for a second time to put an offer of proof on the record, trial counsel refused. Finally, trial counsel reluctantly agreed to reveal his reasons in chambers,

---

**10.** Appellant's brief refers to the witness as Sergeant "Michael" Frisco; however the record reveals that the witness's first name is Nicholas. N.T. 7/11/95 at 14.

explaining that timing was crucial because he intended to introduce two alibi witnesses (Appellant's father and girlfriend) who would testify that Appellant was at home with them when the shots rang out. *Id.* at 21–36. From that point onward, the court allowed trial counsel to question Sergeant Frisco about the time periods between the separate instances of gunfire. *Id.* at 36–41.

Thus, Appellant's claim that trial counsel was improperly limited in his cross-examination of Sergeant Frisco finds no basis in the record. Appellant's claim amounts to little more than a complaint that he was "forced to reveal his trial strategy to the Commonwealth before he was allowed to continue his cross-examination." Brief for Appellant at 23. Appellant asserts that as a result, the Commonwealth was "permitted ... to anticipate and prepare for cross-examination more effectively, to [Appellant's] disadvantage." *Id.* at 23–24.

This claim is absolutely meritless. The Rules of Criminal Procedure require the defense to give the Commonwealth pre-trial notice of the substance of any alibi defense:

> A defendant who intends to offer the defense of alibi at trial shall, at the time required for filing the omnibus pretrial motion under Rule 306, file of record notice signed by the defendant or the attorney for the defendant, with proof of service upon the attorney for the Commonwealth, specifying intention to claim such defense. Such notice shall contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense and the names and addresses of witnesses whom the defendant intends to call in support of such claim.

Pa.R.Crim.P. 305(c)(1)(a). Thus, trial counsel was not compelled to disclose anything to the trial court or the Commonwealth that he was not already required to disclose pre-trial under the Rules of Criminal Procedure.

Appellant next claims that the trial court committed reversible error when it denied Appellant's request for the following jury instruction:

It must be remembered that the prosecution has as great an obligation to discover the truth and assist the Court in reaching a just result as it has the duty to seek and obtain convictions of those charged with crimes.

Defendant's Requested Points for Charge, number 5; N.T. 7/13/95 at 63–64. Appellant's entire argument regarding this issue consists of the following statement:

[T]he requested point of charge reflected that the Commonwealth's burden in presenting non-perjured testimony should be as great as its burden to try and convict individuals with evidence that has been adjudged to be beyond a reasonable doubt.

Brief for Appellant at 25. According to the trial court:

The context of this charge was [Appellant's] argument that based upon the testimony of Monique Wiley, the jury could infer that in interviewing Ms. Wiley prior to trial, the prosecutor was trying to get her to implicate [Appellant] in planning the robbery of Penny Hairston's residence. While this Court did not preclude [Appellant] from making this argument, there was no reason to instruct the jury as [Appellant] had requested because the requested charge was merely a general principle of criminal law which did nothing to assist the jurors in understanding how to view the evidence presented.

Trial Ct. op. at 7–8.

 A trial court has broad discretion in phrasing its points for charge, and is not bound to give instructions in the form requested. *Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61 (1983). A trial court need not accept counsel's wording but may choose its own so long as the "area is adequately, accurately and clearly presented to the jury for their consideration." *Commonwealth v. McComb,* 462 Pa. 504, 341 A.2d 496, 498 (1975). Further, an appellate evaluation of the charge must be based on an examination of the charge as a whole to determine whether it was fair or prejudicial. *Commonwealth v. Wortham,* 471 Pa. 243, 369 A.2d 1287 (1977). Applying these standards and reading the trial court's charge on how to

judge credibility as a whole, *see* N.T. 7/13/95 at 9–19, we conclude that the trial court properly instructed the jury. The trial court did not abuse its discretion in denying Appellant's requested instruction.

Appellant asserts in his final claim of trial error that the trial court's instruction on transferred intent was not supported by the evidence. At the close of evidence, the trial court gave the following instruction to the jury on transferred intent:

If a person specifically intends to kill a particular individual, it does not matter if that person turns out later to have been someone he didn't want to kill or a person of a different name or whatever.

N.T. 7/13/95 at 52. After the trial court's instructions were concluded, the Commonwealth requested that the court give a more specific instruction on transferred intent: "That even if person [sic] shot was not the intended target, the defendant can still be guilty or liable if it is determined that he had the specific intent to kill, regardless of who was actually killed." *Id.* at 62–63. Trial counsel objected on the basis that there was no evidence to support that theory. The trial court overruled the objection and gave the following supplemental instruction:

Now, I mentioned before that a person can be guilty of a crime even if the person he thought he was killing turned out to be someone other than who he really wanted to kill.

I am going to charge you also that if a person shot was not the intended target, the defendant can still be guilty if the jury determines that he had the specific intent to kill somebody regardless of who the person actually killed turned out to be.

In other words, there has to be the intent to kill somebody, even if the wrong person got killed or even if somebody else got killed.

Now, whether that exists depends upon all of the circumstantial evidence.

That is a fact that you have to decide, whether that existed or didn't exist.

That means if a person shoots at somebody and misses and kills somebody else, that intent to kill may still be there, as long as the intent to kill the other person is still there.

*Id.* at 65–66.[11]

Appellant neither asserts that either instruction was an inaccurate statement of the law, nor explains how either instruction denied him a fair trial. The Commonwealth points out that the evidence at trial led to two possible inferences: (1) that Appellant shot the victim because he believed the victim to be someone else; or (2) that Appellant was not necessarily shooting at the victim, but was instead trying to resume the gun battle and inadvertently shot the victim as he fired multiple rounds toward Clymer Street. Given this evidence, we conclude that the trial court did not abuse its discretion by so instructing the jury on the doctrine of transferred intent.

In his first claim of sentencing error, Appellant asserts that he was denied a fair trial by virtue of the Commonwealth's failure to give timely written notice that it would be presenting as an aggravating circumstance that the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6). The Pennsylvania Rules of Criminal Procedure provide that:

The Commonwealth shall file a Notice of Aggravating Circumstances which the Commonwealth intends to submit at the sentencing hearing and contemporaneously provide the defendant with a copy of such Notice of Aggravating Circumstances. Notice shall be filed at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circum-

11. While it is clear from the record that the trial court gave two separate instructions on the doctrine of transferred intent, Appellant fails to specify exactly which instruction he contends was incorrect.

stance after arraignment or the time for filing is extended by the court for cause shown.

Pa.R.Crim.P. 352.

■ Appellant is indeed correct that the Commonwealth did not set forth in its Notice of Aggravating Circumstances that it was proceeding under Section 9711(d)(6). However, as Appellant suffered no prejudice as a result of the Commonwealth's failure, he is entitled to no relief. The intent of Rule 352, as stated in the comment thereto, is "to give the defendant sufficient time and information to prepare for the sentencing hearing." As the Commonwealth points out, Appellant had ample notice that the Commonwealth intended to proceed to trial on a theory that Appellant committed robbery, aggravated assault and murder as part of the same criminal transaction:

[A]ppellant was arraigned on the murder charge ... on March 16, 1994. The bills charging [Appellant] with robbery and aggravated assault were dated May 10, 1994, and he was arraigned on those bills on May 26, 1994. On March 7, 1995, the lower court ordered that the charges be consolidated for trial. Trial began in July, 1995.

Brief for Appellee at 55. Since Appellant had *constructive* notice of the aggravating circumstance specified in Section 9711(d)(6), the trial court did not abuse its discretion in allowing the jury to so consider it during the penalty phase. *See Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994).

■ Appellant next asserts that the evidence was insufficient to support the aggravating circumstance that the defendant committed the killing while in perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), on the basis that "there was no evidence that [Appellant] was perpetrating a felony when the death occurred." Brief for Appellant at 30. We find this assertion disingenuous. The criminal episode which resulted in the murder of the victim was one continuous event beginning when Appellant and his co-conspirators threatened and robbed Edgar Clarke and engaged in a gun battle with Ramon Burton. The robbery and assault culminated in Appellant

fleeing the scene and shooting the victim, an innocent bystander. Appellant's killing of the victim was clearly part of the natural chain of events resulting from this criminal episode. Furthermore, the jury's return of guilty verdicts on the robbery and aggravated assault charges alone supports the aggravating circumstance. *See Commonwealth v. Simmons*, 662 A.2d at 641.

Appellant next asserts that the evidence was insufficient to support the aggravating circumstance that in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7),[12] on the basis that "[t]he evidence indicates that the decedent was the only person in the range of the shooter...." Brief for Appellant at 31. Appellant's argument ignores the fact that he was among the perpetrators of a robbery which precipitated a sequence of events in which a hail of gunfire erupted in the middle of the street in a residential neighborhood, ultimately resulting in the killing of an innocent bystander. Clearly, there was sufficient evidence to support the jury's finding that such conduct created a grave risk of death to another person in addition to the victim.

Appellant next asserts that the evidence was insufficient to support the aggravating circumstance that the defendant committed the killing while in the perpetration of a drug felony, 42 Pa.C.S. § 9711(d)(13), because "[t]he Commonwealth did not present a scintilla of evidence that this case involved the commerce of drugs...." Brief for Appellant at 32. This claim is meritless. The evidence adduced at trial clearly supports the theory that the Clymer Street gun battle and the subsequent shooting of the victim were the direct result of Appellant's and his accomplices' planned robbery of a rival drug dealer. We must agree with the Commonwealth that "[t]his was a classic example of a drug turf war, and the events were inextricable from violations of the controlled substances act." Brief for Appellee at 65. The evidence was

---

12. Appellant incorrectly refers to this aggravating circumstance in his brief as aggravating circumstance number eight.

sufficient to support a finding that Appellant killed the victim while in the perpetration of a drug felony.

Appellant next asserts that trial counsel was ineffective for failing to assert that the evidence was insufficient to support the aggravating circumstance that the defendant has a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9). Although this claim too has been technically waived for failing to assert it in post-trial motions when Appellant was represented by appellate counsel, we nevertheless will consider Appellant's claim under the relaxed waiver rule applicable to direct capital appeals. *Zettlemoyer.*

■■■ Appellant contends that his two convictions for assault, which were committed while he was a juvenile, fall short of establishing a "significant history." This claim too is meritless. As the Commonwealth points out:

[Appellant] had three previous convictions for violent aggravated assaults.* He was adjudicated delinquent for aggravated assault for stabbing a man on August 26, 1986. He was adjudicated delinquent for aggravated assault for shooting a fourteen-year-old boy on July 10, 1987. He was also adjudicated delinquent for aggravated assault for stabbing yet another man on July 10, 1987 (N.T. 7/17/95, 50–52).

---

* Since he had three aggravated assault adjudications, [Appellant's] contention that he had only two previous assault convictions is simply not true (Brief for Appellant, 33).

Brief for Appellee at 67–68. Appellant's three prior convictions for aggravated assault were clearly sufficient to support the aggravating circumstance specified in Section 9711(d)(9). Trial counsel was not ineffective for failing to assert this baseless claim.

Finally, Appellant claims that trial counsel was ineffective for failing to properly prepare for the penalty phase of trial. At the beginning of the penalty phase, trial counsel informed the court that he wished to present psychological evaluations Appellant received while at a juvenile detention center, which trial counsel had only recently discovered the existence of.

The trial court sustained the Commonwealth's objection to the introduction of the records into evidence, ruling that the evaluations were inadmissible unless they could be authenticated by a witness or witnesses who could be cross examined about the opinions contained therein. Appellant now claims that counsel was ineffective for not preparing to have witnesses available to testify about these evaluations.

In order for Appellant to establish that trial counsel was ineffective for failing to present witnesses, Appellant must establish: (1) the witnesses existed; (2) the witnesses were available; (3) that counsel was informed of the existence of the witnesses or should have known of the witnesses' existence; (4) that the witnesses were available and prepared to cooperate and would have testified on Appellant's behalf; and (5) the absence of testimony prejudiced Appellant. *Commonwealth v. Crawley*, 541 Pa. 408, 663 A.2d 676 (1995).

Appellant does not identify any witnesses who were available and willing to testify on his behalf. Although Appellant does state that the evaluations at issue "were a part of [Appellant's] juvenile file and defense counsel would have been aware of them if he had questioned his client or he had traced his clients [sic] prior criminal history through the discovery process," Brief for Appellant at 34, Appellant nevertheless fails to demonstrate any prejudice. Accordingly, Appellant has failed to meet his burden of proving that there were witnesses available and willing to testify and that the substance of their testimony would have been helpful to him.

Section 9711(h)(3) of the Judicial Code provides that:

The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[13]

Having reviewed the record in this case, we do not find that the sentence of death was the product of passion, prejudice or any other arbitrary factor. As we have already concluded that each of the aggravating factors found by the jury which are specified in 42 Pa.C.S. § 9711(d) are supported by the record (*see, supra*), we cannot possibly conclude that the evidence fails to support the finding of at least one aggravating circumstance. Further, based on our review of the statistical data provided by the Administrative Office of Pennsylvania Courts, we conclude that the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases.

The judgment of sentence is affirmed.[14]

---

**13.** Effective June 25, 1997, the General Assembly removed proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and the part of subsection (h)(4) that references proportionality review. *See* Act 28 of 1997. However, because Appellant's sentence of death was imposed before the effective date of the act, he is statutorily entitled to proportionality review. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998).

**14.** The Prothonotary is directed to transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court. 42 Pa.C.S. § 9711(i).