J-A04005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER RUSSELL | : | |
| | : | |
| Appellant | : | No. 1291 EDA 2017 |

Appeal from the Judgment of Sentence August 9, 2010
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011005-2009,
CP-51-CR-0011006-2009, CP-51-CR-0011011-2009,
CP-51-CR-0011012-2009, CP-51-CR-0011013-2009,
CP-51-CR-0011030-2009, CP-51-CR-0011090-2009,
CP-51-CR-0011091-2009

BEFORE:  LAZARUS, J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 24, 2019**

Christopher Russell appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after a jury found him guilty of multiple counts of aggravated assault, robbery and related offenses. Upon careful review, we affirm.

During the time period of September 2008 through March 2009, Russell engaged in a string of violent robberies against nine victims, most of them elderly women, whom he had followed to their homes.  Russell typically approached the women from behind, violently assaulted them, stole their handbags, and fled.  All of the victims were able to provide a physical description of their assailant to the police, and many were able to describe the vehicle in which he fled from the scene.  Russell's DNA was found on a cell

*Retired Senior Judge assigned to the Superior Court.

phone dropped at the scene of one robbery, and the phone contained names and phone numbers contained in other phones owned by Russell. A bank statement belonging to one of the victims was found in the trash outside Russell's home. When Russell was arrested, he was wearing a cap identical to one that two victims described their assailant as having worn.

On June 21, 2010, a jury found Russell guilty of eight counts of aggravated assault,[1] nine counts of robbery,[2] seven counts of burglary,[3] and one count of possession of marijuana.[4] On August 9, 2010, the trial court sentenced Russell to an aggregate term of 63 to 126 years' incarceration. Russell appealed to this Court, which affirmed his judgment of sentence on July 16, 2012; the Pennsylvania Supreme Court denied allowance of appeal. On April 2, 2014, Russell filed a timely first petition under the Post Conviction Relief Act ("PCRA"); counsel was appointed and filed an amended petition seeking reinstatement of Russell's appellate rights *nunc pro tunc*.[5] The PCRA

_____

[1] 18 Pa.C.S.A. § 2702(a).

[2] 18 Pa.C.S.A. § 3701(a).

[3] 18 Pa.C.S.A. § 3502(a).

[4] 35 P.S. § 780-113(a)(31).

[5] On direct appeal, this Court found both of Russell's appellate claims waived because the notes of testimony from trial were not made part of the certified record on appeal. In his amended PCRA petition, Russell claimed ineffectiveness on the part of appellate counsel for failing to ensure the certified record was complete. The Commonwealth did not object to the grant of PCRA relief.

- 2 -

J-A04005-19

court granted relief and Russell filed this timely appeal, *nunc pro tunc*, followed by a court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). He raises the following claims for our consideration:

> 1. Whether the judgment of sentence must be vacated in light of **Alleyne** [**v. United States**, 570 U.S. 99 (2013),] and its progeny as the Commonwealth invoked a mandatory penalty under 42 Pa.C.S. § 9717 at sentencing?
>
> 2. Whether the evidence was sufficient to support the convictions for aggravated assault as the evidence neither established that the victims suffered serious bodily injury nor that Mr. Russell intended to cause the same?
>
> 3. Whether a new trial must be ordered because the Commonwealth improperly joined the charge of possession of marijuana with the other transcripts in this case and in any event had no right to a jury trial for that charge?
>
> 4. Whether the evidence was in any event insufficient to support a conviction for possession of marijuana as the Commonwealth did not prove each and every element of the crime?
>
> 5. Whether the trial court erred in denying the motion to suppress identification insofar as the procedure utilized by law enforcement was unduly suggestive and violative of the Pennsylvania and United States Constitutions?

Brief of Appellant, at 8-9.[6]

Russell first claims that his judgment of sentence must be vacated pursuant to **Alleyne**, as the Commonwealth sought a mandatory minimum

---

[6] In his statement of questions involved, Russell also raises a challenge to the discretionary aspects of his sentence. However, in the argument section of his brief, Russell concedes that he has waived that argument because prior counsel failed to file a post-sentence motion raising the claim.

sentence under section 9717 of the Sentencing Code, which imposes mandatory minimum sentences in certain cases where the victim is over the age of 60.[7] Russell was convicted of six counts of aggravated assault involving victims over the age of 60. For the following reasons, he is entitled to no relief.[8]

---

[7] Specifically, section 9717 provides, in relevant part:

> (a) Mandatory sentence.--A person under 60 years of age convicted of the following offenses when the victim is over 60 years of age and not a police officer shall be sentenced to a mandatory term of imprisonment as follows:
>
> > 18 Pa.C.S. § 2702(a)(1) and (4) (relating to aggravated assault)--not less than two years.

42 Pa.C.S.A. § 9717(a).

[8] The trial court incorrectly asserts that *Alleyne* is not applicable to Russell's case because his original direct appeal concluded on May 29, 2013 and, thus, preceded *Alleyne*, which has been held to apply retroactively only to cases pending on direct appeal at the time it was decided. Our Supreme Court has previously held that, where a direct appeal *nunc pro tunc* is granted, the conviction in question was never "final" for purposes of determining whether the litigant is entitled to the benefit of a new rule of law announced subsequent to his conviction. *See Commonwealth v. Johnson*, 304 A.2d 139, 141 (Pa. 1973). Thus, as the Commonwealth concedes, Russell would be entitled to the benefit of *Alleyne*, as his appellate rights were reinstated, *nunc pro tunc*, and his judgment of sentence, therefore, was not final at the time *Alleyne* was decided.

The trial court also finds *Alleyne* inapplicable because, like the fact of a prior conviction, the "aggravating fact" of a victim's age is "a black and white, objective fact." Trial Court Opinion, 3/19/18, at 14. However, as the Commonwealth also concedes, this interpretation impermissibly extends the holding of *Alleyne*, which applies to "[a]**ny fact** that, by law, increases the penalty for a crime[.]" *Alleyne*, 570 U.S. at 103 (emphasis added).

- 4 -

Here, the trial court explicitly stated that it did not sentence Russell under the mandatory minimum statute, but rather, sentenced him in accordance with the Sentencing Guidelines. *See* Trial Court Opinion, 3/19/18, at 14-15, citing N.T. Sentencing, 8/9/10, at 3-4, 12, 16-18. We have previously held that, where a trial court imposes sentence in accordance with the guidelines and does not sentence in accordance with a mandatory minimum sentencing scheme, an appellant is not entitled to relief under *Alleyne*.

In *Commonwealth v. Samuel*, 102 A.3d 1001 (Pa. Super. 2014), the defendant was convicted of drug trafficking offenses. At the time of his sentencing, 18 Pa.C.S.A. § 7508 provided for mandatory minimum sentences for drug trafficking convictions, and the length of the mandatory minimum depended on the amount of the drug involved. At sentencing, the Commonwealth presented evidence regarding the amount of cocaine Samuel possessed. Samuel argued that, pursuant to this Court's decision in *Commonwealth v. Munday*, 78 A.3d 661 (Pa. Super. 2013), in which we found that the imposition of the mandatory sentencing provision of 42 Pa.C.S. § 9712.1 violated *Alleyne*, it was for the jury, and not the trial court, to determine whether he possessed enough cocaine so as to implicate the mandatory minimum sentence statute. We rejected Samuel's claim, reasoning as follows:

> As a general matter, Samuel is correct; any fact that could increase the proscribed range of penalties to which a defendant is exposed must be found by a jury. *Munday*, 78 A.3d at 664–666.

The record is clear, however, that the trial court did not sentence him in accordance with mandatory minimum sentence provisions or any other enhancement that required a factual predicate before application. Rather, the record reveals that the trial court sentenced Samuel within the standard guideline ranges, which were substantially elevated because of Samuel's prior record score of five. Thus, although it was not for the trial court to make the determination as to how much cocaine Samuel possessed for purposes of determining whether mandatory minimum sentencing provisions applied, this error had no impact on Samuel's sentence. Samuel's challenge to the legality of his sentence fails.

*Samuel*, 102 A.3d at 1008. *See also Commonwealth v. Zeigler*, 112 A.3d 656 (Pa. Super. 2015) (addressing, *sua sponte*, legality of sentence where mandatory minimum statute existed for appellant's aggravated assault conviction, but concluding sentence not illegal on *Alleyne* grounds because court did not sentence based on mandatory minimum, but rather exceeded mandatory minimum sentence by applying guidelines).

In support of his claim, Russell cites this Court's decision in *Commonwealth v. Mosley*, 114 A.3d 1072 (Pa. Super. 2015), for the proposition that, even where a sentence exceeds that prescribed by a mandatory minimum, it is still invalid under *Alleyne*. *Mosley* is distinguishable and garners Russell no relief.

In *Mosley*, the appellant was sentenced under section 7508 of the Sentencing Code (imposing mandatory minimum based on weight of controlled substance possessed) after the trial court, in an attempt to comply with *Alleyne*, presented the jury with a special verdict form that included the following specific issue: "If you find the defendant guilty of Count 4(c): possession with intent to deliver, do you find the defendant guilty of

- 6 -

possession with intent to deliver greater than 10 grams of cocaine?" ***Mosley***, 114 A.3d at 1090.

This Court vacated Mosley's sentence, finding:

> the trial court exceeded its authority by permitting the jury, via a special verdict slip, to determine beyond a reasonable doubt the factual predicate of section 7508—whether Mosley possessed cocaine that weighed greater than 10 grams. Even though the jury responded "yes" to the inquiry, the trial court performed an impermissible legislative function by creating a new procedure in an effort to impose the mandatory minimum sentence in compliance with ***Alleyne***.

***Mosley***, 114 A.3d at 1091.

The facts of ***Mosley*** are clearly distinguishable from the case at bar. Contrary to Russell's claim, the length of the sentence imposed in ***Mosley*** was not a factor in this Court's analysis. Rather, we reversed solely on the basis that the sentencing court impermissibly utilized a special verdict slip in an attempt to impose a mandatory minimum that did not offend ***Alleyne***. In contrast, in the matter *sub judice*, the sentencing court explicitly did <u>not</u> sentence Russell in accordance with the mandatory minimum, instead opting to impose a guideline sentence. Pursuant to ***Samuel*** and ***Zeigler***, such a sentence is not illegal under ***Alleyne***. Accordingly, Russell is entitled to no relief.

Russell next asserts that the evidence presented at trial was insufficient to support his convictions for aggravated assault as to victims Jean Kreamer, Kathleen Carey, and Joan Gaffner. Specifically, Russell asserts that the testimony of these victims did not establish that they suffered "serious bodily

injury" within the meaning of 18 Pa.C.S.A. §§ 2301 and 2702(a). Nor, he claims, did the evidence prove that he attempted to cause such injury. Russell's claim fails.

A determination of evidentiary sufficiency presents a question of law. As such, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011). In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Von Evans*, 163 A.3d 980, 983 (Pa. Super. 2017). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon–Plaza*, 136 A.3d 521, 525–26 (Pa. Super. 2016) (citation omitted). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–93 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994 (Pa. Super. 2015).

The offense of aggravated assault is defined, in relevant part, as follows:

(a) Offense defined.—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a). Serious bodily injury is "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. "[A]ttempt," for aggravated assault purposes, can be found where "the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another." *Commonwealth v. Woods*, 710 A.2d 626, 630 (Pa. Super. 1998), quoting *Commonwealth v. Lopez*, 654 A.2d 1150, 1154 (Pa. Super. 1995). The conduct giving rise to an inference that defendant intended to cause serious bodily injury need not in itself be life threatening. *Commonwealth v. Rightley*, 617 A.2d 1289, 1295 (Pa. Super. 1992).

The trial court summarized the testimony of the three victims, in relevant part, as follows:

[Kathleen] Carey, who was seventy-one years old at the time of trial, testified that on March 3, 2009, [Russell] attacked her as she was entering her apartment on the 6300 block of Bingham Street in Philadelphia. She testified that she had just moved her trash cans back from the curb and was putting the keys in the door when [Russell] approached her from behind. Ms. Carey asked him if he had "the right address," and [Russell] responded "18." [Russell] then lunged at Ms. Carey and put his hand over her mouth, which caused Ms. Carey to fall down the stairwell leading to her basement; fortunately, she was able to catch hold of the handrail to prevent her from falling all the way down. As she

- 9 -

struggled to her feet, [Russell] took Ms. Carey's tote bag from her shoulder and left.

. . .

[E]ighty-year-old victim Jean Kraemer . . . testified that on March 5, 2009, at 11:50 a.m., she was just returning from the supermarket and bringing the last bag of groceries inside her home on the 600 block of Benner Street, when she heard a knock at the door. She went to the door and encountered [Russell], who asked if she would like to buy some Girl Scout cookies. Mrs. Kraemer responded, "Yes," and that she would like to buy "two boxes of the mint cookies." [Russell] replied that he had to go to his car to retrieve them. He returned a couple minutes later with a bag; Mrs. Kraemer noticed that the bag was not big enough to hold two boxes of cookies and began to feel anxious. [Russell] then stepped inside her doorway, grabbed her left shoulder, and knocked her down. Mrs. Kraemer fell backwards and struck her head on the floor.

. . .

Joan Gaffner, another elderly victim, . . . testified that on September 12, 2008, at 12:20 p.m., she was pulling into her driveway after a trip to the supermarket, when she saw a car speeding up to her driveway on the 1100 block of Unruh Avenue. The car stopped, and she and [Russell] looked at each other. [Russell] then drove away. Ms. Gaffner was beginning to take her groceries inside, when she saw the same car backing up slowly to her driveway. [Russell] rolled down the window and asked her for directions to Magee Street. Ms. Gaffner told him it was the next street down. When she turned to pick up her groceries, [Russell] grabbed her from behind, pinned her arm against her chest, pushed her into her basement doorway, and knocked her down. [Russell] then stood over Ms. Gaffner and punched her twice in the stomach. Ms. Gaffner pleaded, "Please don't hurt me." [Russell] put his foot on top of her stomach, and took her pocketbook, which he placed in a plastic bag that he was carrying. [Russell] then punched Ms. Gaffner a third time in the stomach before fleeing her residence.[17]

[17] Ms. Gaffner also suffered bruises to her arm and a cut to her lip during the attack.

- 10 -

Trial Court Opinion, 3/19/18, at 6, 8-10 (citations to record and footnotes omitted).

We conclude that the evidence presented at trial was sufficient to allow a jury to conclude that Russell intended to cause serious bodily injury when he knocked three elderly women to the ground. Based on the totality of the evidence presented, the jury could have found that Russell, who was substantially larger and stronger than his victims, intentionally acted in a manner which constituted a substantial or significant step toward perpetrating serious bodily injury upon his elderly victims. **See Woods**, **supra**. Russell pushed Kathleen Carey down as she stood at the top of a flight of stairs. Although Carey was able to break her fall by grabbing a railing, the jury could nonetheless have inferred that Russell intended to cause her to fall all the way down the stairs and cause serious bodily injury. Similarly, Russell knocked Jean Kraemer, a then-79-year-old woman, to the ground near a flight of stairs. As a result, she fell backwards, striking her head on the floor. Finally, after knocking Joan Gaffner to the floor, Russell proceeded to punch her twice in the stomach before taking her purse. He then gratuitously punched her one final time as she lay on the floor, even though the object of his attack—the theft of her purse—had already been accomplished. This evidence was sufficient to establish that Russell committed the offense of aggravated assault against Kathleen Carey, Jean Kraemer, and Joan Gaffner.

Russell's reliance on **Commonwealth v. Burton**, 2 A.3d 598 (Pa. Super. 2010), is misplaced. In that case, the defendant was convicted of

aggravated assault after he caused his victim to suffer a major brain injury by sucker-punching him once on the street. On appeal, Burton acknowledged that his victim suffered serious bodily injury, but argued the evidence was insufficient to establish his intent to cause such injury. In its analysis, the Court reviewed our Supreme Court's decision in ***Commonwealth v. Alexander***, 383 A.2d 887 (Pa. 1978). There, the Court also addressed a scenario in which a single sucker-punch led to a charge of aggravated assault. In ***Alexander***, however, the victim did not suffer serious bodily harm. Under those circumstances, the Court noted, a defendant may only be convicted of aggravated assault if the Commonwealth proves the blow was inflicted with the intent to inflict serious bodily injury. The Court held that such intent must be gleaned from "the other circumstances surrounding the defendant's attack on the victim." ***Id.*** at 889. The ***Alexander*** court enumerated several factors which may be considered in making that determination: whether the attacker was disproportionately larger or stronger than the victim; whether the attacker was restrained from escalating his attack upon the victim; whether the attacker had a weapon or other implement to aid his attack; and whether the attacker made any statements before, during, or after the attack which might indicate his intent to inflict further injury upon the victim. ***See id.***

Turning to the facts of the case before it, the ***Burton*** court noted the presence of the following factors: the appellant was significantly stronger and larger than the victim; the appellant was ten years younger than the victim; the appellant's actions and statements before and after the assault confirmed

- 12 -

that he intended to inflict the victim's injuries; and the victim was unprepared for the attack. Taken together, the Court concluded that circumstances established Burton intended to cause serious bodily injury.

Contrary to Russell's claim, **Burton** actually supports a finding that Russell possessed the requisite intent to cause serious bodily harm to his victims. Indeed, in the matter *sub judice*, three out of the four factors cited in **Burton** are present: Russell was stronger and larger than his victims; Russell was substantially younger than his elderly victims; and he approached his victims from behind, surprising them and catching them off-guard. Accordingly, **Burton** is of no assistance to Russell and his claim must fail.

Russell's next two claims involve his conviction for possession of marijuana. Russell asserts that he is entitled to a new trial because the Commonwealth improperly joined the possession charge with the robbery-related charges even though he was not arrested with marijuana during the course of the other crimes. He asserts that the error was not harmless because there was "a real risk that the jury misused the evidence that he was in possession of marijuana at the time of his arrest, *i.e.*, that [Russell] is an all-around bad guy." Brief of Appellant, at 35. He further argues that the Commonwealth was not entitled to a jury trial on the charge because the maximum penalty was a mere thirty days; as such, it is not a "serious" crime for purposes of jury trial rights. *Id.*, citing **Commonwealth v. Kerry** (906 A.2d 1237 (Pa. Super. 2006) (defendant not entitled to jury trial where

maximum penalty for offense is six months' imprisonment).  Russell is entitled to no relief.

In order to preserve a claim for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court, or the claim is waived.  ***Commonwealth v. Houck***, 102 A.3d 443 (Pa. Super. 2014).

> On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.  The princip[al] rationale underlying the waiver rule is that when an error is pointed out to the trial court, the court then has an opportunity to correct the error.  By specifically objecting to any obvious error, the trial court can quickly and easily correct the problem and prevent the need for a new trial.  Additionally, the appellate court should not be required to waste judicial resources correcting a problem that the trial court could have easily corrected if it had been given the opportunity to avoid the necessity of granting a new trial.

***Fillmore v. Hill***, 665 A.2d 514, 516 (Pa. Super.  1995) (internal citations omitted).

Here, Russell never objected before the trial court to the Commonwealth's joinder of the marijuana charge to the robbery-related charges.  Russell did not raise the issue in a pre-trial motion, nor did he object at the time of trial.  In fact, at the time of his arraignment, Russell stated that he wished to be tried by a jury on the charge.

> THE COURT CRIER: To Docket No. CP-51-CR-0011091-2009, charging you with possession of marijuana, how do you plead?
>
> THE DEFENDANT: Not guilty

> THE COURT CRIER: Having pled not guilty to these charges, how do you wish to be tried, by the Judge, or by the jury?
>
> THE DEFENDANT: By the jury.

N.T. Trial, 6/16/10, at 9-10.

Because a claim may not be raised for the first time on appeal, Russell has waived his challenge to the joinder of the marijuana charge. **See** Pa.R.A.P. 302(a).

Russell also challenges the sufficiency of the evidence with respect to his conviction for possession of marijuana. Russell asserts that, because the Commonwealth did not offer into evidence a chemical analysis of the marijuana, but rather relied upon the results of a field test for tetrahydrocannabinol ("THC"), his conviction cannot stand. This claim is also waived.

An issue will be deemed to be waived where an appellant fails to properly explain or develop it in his brief. **See Commonwealth v. LaCava**, 666 A.2d 221, 235 (Pa. 1995) (failure to sufficiently explain claim waives consideration of claim since this Court will not make appellant's arguments for him); **Commonwealth v. Ragan**, 645 A.2d 811, 828 (Pa. 1994) (failure to elaborate on mere assertion renders claim waived). Here, in his undeveloped one-paragraph argument on this issue, Russell fails to cite to any authority in support of his position. **See Commonwealth v. Brougher**, 978 A.2d 373 (Pa. Super. 2009) (claim waived if no citation to authority). Indeed, the only case Russell cites—an unreported, non-precedential decision of this Court—is presented in a footnote in order to satisfy counsel's "ethical duty to make the

Court aware of law contrary to his position." Brief of Appellant, at 38 n.2, citing ***Commonwealth v. Carroll***, 1157 MDA 2012 (Pa. Super. Mar. 6, 2013) (unpublished memorandum) (finding field test sufficient to establish illegality of substance) (emphasis added). Accordingly, Russell has waived his claim that the evidence was insufficient to convict him of possession of marijuana.

Russell next claims that the trial court erred in denying his motion to suppress the in- and out-of-court identifications made by victims Kathleen Carey, Marianne Nuzzo, Joan Gaffner, Patricia Gordon-Mann, and Jean Kraemer on the basis that they were made under unduly suggestive circumstances after the victims saw his photograph in the media. Russell asserts that this case is controlled by the United States Supreme Court's decision in ***Foster v. California***, 394 U.S. 440 (1969), in which the Court found that a lineup procedure "so undermined the reliability of the eyewitness identification as to violate due process." ***Id.*** at 443. Russell further asserts that the Commonwealth failed to carry its burden of establishing that an independent basis existed for the victims' in-court identifications. Brief of Appellant, at 46, citing ***Commonwealth v. Carter***, 643 A.2d 61 (Pa. 1994). We disagree, and conclude that the trial court properly declined to suppress the in- and out-of-court identifications.

We begin by noting our standard of review of the denial of a suppression motion:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences

and legal conclusions drawn by the suppression court from those findings are appropriate. **Commonwealth v. Davis**, [] 421 A.2d 179 ([Pa.] 1980). [Where the Commonwealth] prevailed in the suppression court, we may consider only the evidence of the [Commonwealth] and so much of the evidence for the [defense] as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. **Commonwealth v. Bomar**, [] 826 A.2d 831, 842 ([Pa.] 2003) (citations omitted). However, where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts." **Commonwealth v. Nester**, [] 709 A.2d 879, 881 ([Pa.] 1998).

**In re O.J.**, 958 A.2d 561, 564 (Pa. Super. 2008).

A court must assess the reliability of an out-of-court identification by examining the totality of the circumstances. **Commonwealth v. Johnson**, 139 A.3d 1257, 1278 (Pa. 2016), citing **Manson v. Brathwaite**, 432 U.S. 98, 114 (1977). A pre-trial identification will not be suppressed as violative of due process unless the facts demonstrate that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." **Commonwealth v. Carson**, 741 A.2d 686, 697 (Pa. 1999), quoting **Simmons v. United States**, 390 U.S. 377, 384 (1968). The reliability of an out-of-court identification is determined by considering the totality of the circumstances, including, *inter alia*, the following specific factors: (1) the witness' ability to observe the criminal act; (2) the accuracy of the photo array selection and other descriptions; (3) the lapse of time between the act and any line-up; and (4) any failure to identify

the defendant on prior occasions. ***Commonwealth v. Santiago***, 855 A.2d 682, 698 (Pa. 2004). "[T]he purpose of a suppression order regarding exclusion of identification evidence is to prevent improper police action. Thus, where a defendant does not show that improper police conduct resulted in a suggestive identification, suppression is not warranted." ***Commonwealth v. Sanders***, 42 A.3d 325, 330 (Pa. Super. 2012) (citations and footnotes omitted).

Additionally, even if an out-of-court identification is suggestive, an in-court identification is admissible if there exists an independent basis for the identification. ***Commonwealth v. Fisher***, 769 A.2d 1116, 1127 (Pa. 2001). An independent basis is established when the in-court identification resulted from the criminal act and not the suggestive identification procedure. ***Commonwealth v. Davis***, 17 A.3d 390, 394 (Pa. Super. 2011). To determine if an identification resulted from the criminal act and, therefore, has an independent basis, the trial court must consider the following factors:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

***Id.***

Here, Russell failed to demonstrate that the conduct of the Philadelphia Police Department in releasing his mug shot to the press was improper and, thus, the out-of-court identifications were impermissibly tainted. Russell presented no evidence that the photograph was publicized for any reason

- 18 -

other than to aid in his apprehension once the authorities had reason to believe he was the perpetrator of multiple violent robberies. Notably, Russell does not argue that the photographic arrays presented to the victims were in any way suggestive. Rather, he baldly asserts that the police improperly released his photograph to the media. There is no support in the record for this claim. Thus, any argument about the impact of media exposure on the victims' identification of Russell as their assailant is relevant to weight, not admissibility, and the jury was free to believe or disbelieve the victims' testimony, which was subject to cross-examination by the defense at trial. *Commonwealth v. Steele*, 559 A.2d 904, 910 (Pa. 1989) (claim that identification of perpetrator tainted by newspaper photographs goes to weight and not admissibility); *Sanders*, *supra* (arguments about the circumstances in which victim made identification go to weight and not admissibility).

Moreover, the testimony of the victims at the preliminary hearing[9] established the independent reliability of their identifications. *Fisher*, *supra*; *Davis*, *supra*. Joan Gaffner testified that she was approached in broad daylight on a sunny day and interacted with Russell prior to actually being attacked. Specifically, Russell drove his car into Gaffner's driveway, rolled down the window, and asked Gaffner for directions, before returning moments later to attack her as she finished carrying groceries into her basement. *See*

_____

[9] At the suppression hearing, the Commonwealth, without objection, entered the preliminary hearing transcript into evidence in lieu of calling the victims to testify again.

- 19 -

N.T. Preliminary Hearing, 7/21/09, at 16-17. Following her attack, Gaffner was able to provide police with a detailed description of her assailant. Finally, she testified as follows:

> Q: Do you recognize the person who was there that day in the room today?
>
> A: Oh, yes I do.
>
> Q: And can you point that person out, please?
>
> A: Right there.
>
> MS. KEATING: Indicating by point of finger the Defendant at the bar of the court, Christopher Russell.
>
> THE WITNESS: <u>I won't forget that face</u>.

N.T. Preliminary Hearing, 7/21/09, at 18 (emphasis added).

Kathleen Carey testified that she had a conversation with Russell before he attacked her. Specifically, she noticed him standing behind her at her door and asked him if he was in the right apartment. Carey was also able to describe her attacker to police; she testified at the preliminary hearing as follows:

> Q: Now, did you get a chance to see the face of the person who did it?
>
> A: <u>Yes, I will never forget that face</u>.
>
> Q: Do you see anyone in court now that also was there that day?
>
> A: Yes.
>
> Q: Can you point that person out for the judge?
>
> MS. KEATING: Indicating by point of finger the Defendant Christopher Russell, I am going to stipulate with counsel that there was a pause in staring at the Defendant before making that identification.

*Id.* at 32 (emphasis added).

Jean Kraemer also had a conversation with Russell immediately prior to the attack, in which Russell approached her and asked if she would like to purchase Girl Scout cookies. She asked him questions, they discussed price, and she agreed to purchase some cookies. He went to his car, ostensibly to retrieve the cookies, and, upon returning, attacked Kraemer. After he threw her to the ground, Kraemer was further able to observe Russell's interaction with her husband, who was seated in the house and from whom Russell demanded money. Kraemer gave the police a description of her assailant. She testified that she saw his photograph once in the newspaper prior to being presented with a photo array by police, at which time she identified Russell with 70-80% certainty. Kraemer also identified Russell in court at the preliminary hearing.

Maryanne Nuzzo testified that she had just arrived home and was looking at her mail outside her front door when Russell ran up behind her. She testified that she looked him in the eye and he briefly smiled at her. After the attack, Nuzzo testified that she saw Russell get into the back of a light-colored sedan and drive away. Approximately one month later, Nuzzo was watching the news and saw Russell's photograph, which caused her to do a "double take" and say to herself, "this is my guy." *Id.* at 84. She immediately contacted police and participated in a photo lineup, at which time she selected Russell's picture. She testified that she then told police she would know for

certain if Russell was her attacker when she saw him face to face. After observing Russell at the preliminary hearing, Nuzzo testified as follows:

> Q: And do you know for certain today?
>
> A: Yes, I do.

*Id.*

Lastly, Patricia Gordon-Mann testified that she had just returned home and was fumbling for her keys at her front door when Russell walked behind her and "came very close." *Id.* at 90. She asked him "who are you here for[?]" and he responded, "I'm here for you," and punched her in the face. *Id.* She was able to provide police with a description of her assailant in the immediate aftermath of the attack. She testified as follows regarding her identification of Russell as her attacker:

> Q: Now, did you ever have a chance to see the Defendant again after this happened to you and before today?
>
> A: Yes, I saw him on television and that probably was in February. I don't know the exact date.
>
> Q: What happened when you saw him on T.V.?
>
> A: I immediately called and said that's my guy. . . . And then again [Detective] Mark Cannon came with a photo array and asked me to pick him out and once again I picked him out.

*Id.* at 92. Gordon-Mann also identified Russell in court at the preliminary hearing.

In light of the foregoing testimony, we find that the trial court properly concluded that the victims recognized Russell based on their own perceptions of him and not due to any media exposure. All the victims had an

opportunity—some an extensive opportunity—to view their assailant face-to-face at the time of the attacks. The victims provided police with consistent, detailed, and accurate physical descriptions of Russell.

In light of the foregoing, the trial court did not err or abuse its discretion in declining to suppress either the out-of-court or in-court identifications made by victims Joan Gaffner, Kathleen Carey, Jean Kraemer, Maryanne Nuzzo and Patricia Gordon-Mann.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/24/19