J-S08012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM DUANE MALDONADO-ROSADO | |
| Appellant | No. 1411 MDA 2020 |

Appeal from the Judgment of Sentence Entered May 27, 2020
In the Court of Common Pleas of Lebanon County
Criminal Division at No.: CP-38-CR-0000698-2019

BEFORE:  STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.: **FILED JUNE 10, 2021**

Appellant William Duane Maldonado-Rosado appeals from the May 27, 2020 entered in the Court of Common Pleas of Lebanon County ("trial court"), following his jury convictions for possession with intent to deliver ("PWID") (heroin and fentanyl), possession of a controlled substance, possession of drug paraphernalia, and false identification to law enforcement.[1] Upon review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), (16), and (32); and 18 Pa.C.S.A. § 4914(a), respectively.

The facts and procedural history of this case are undisputed. Following a traffic stop, Appellant was charged with the foregoing crimes. The case eventually proceeded to a jury trial,[2] summarized by the trial court as follows:

On April 13, 2019, the Lebanon County Drug Task Force was told that a vehicle registered to Vivian Hummel would be returning to Lebanon from Philadelphia with a large amount of heroin. Because of this tip, officers positioned themselves near the exit of the Lebanon-Lancaster Interchange of the Pennsylvania Turnpike. They observed the anticipated Dodge Caravan vehicle leaving the Turnpike and turning on Route 72 in the direction of Lebanon. [Appellant] was the operator of the vehicle. Police undertook a traffic stop in southern Lebanon County. When originally approached by police, [Appellant] provided a false name. Eventually, [Appellant] was placed under arrest because of a warrant that had been issued for him on an unrelated matter. Prior to being removed from the scene of the traffic stop, [Appellant] acknowledged that he had heroin in his possession. [Appellant] was transported to the Lebanon Central Booking facility. A strip search was conducted by Detective Ryan Mong at that facility. During the search, heroin baggies fell from [Appellant's] socks and pants. A large bundle of heroin was discovered inside [Appellant's] buttocks. Ultimately, ninety-four (94) bags of heroin were recovered from [Appellant]. Photographs were presented of all of the bags of heroin.

Several were packaged within distinctively emblazoned bags. Detective Mong packaged the heroin seized from [Appellant] in a large manila envelope. That envelope was placed in a temporary storage locker pending transport to the Pennsylvania State Police Crimes Laboratory. The envelope was sealed with evidence tape. No one other than Drug Task Force officers had access to the storage locker.

Detective Lawrence Minnick of the Lebanon City Police Department was tasked with processing the drugs for transportation to the Pennsylvania State Police Crimes Laboratory.

---

[2] We note with strong disapproval that, despite being represented by counsel and cautioned repeatedly by the trial judge, Appellant filed over 70 *pro se* motions in the trial court.

At some point, Detective Minnick mistakenly logged the drugs seized from [Appellant] as having been recovered from an individual named "Rodriguez". Other than a singular reference to the name "Rodriguez", all other documentation regarding the manila envelope packaged by Detective Mong referenced [Appellant's] name. Police characterized the reference to "Rodriguez" as a typographical error and they vociferously denied that the evidence seized from [Appellant] was ever co-mingled with evidence from any other case.

Gabriel Llinas was a forensic technician employed by the Pennsylvania State Police. Mr. Llinas performed the drug identification analysis of the substances packaged by Detective Mong. The packages that Mr. Llinas evaluated were identical in description to those that were packaged by Detective Mong. Both the items recovered from [Appellant] and the items tested by Mr. Llinas were packaged in bags emblazoned with "Walking Dead" and "Fendi". Mr. Llinas testified that the substances contained in the bags included heroin, fentanyl and acetyl fentanyl. Mr. Llinas also testified that the weight of the substances exceed one (1) gram but not ten (10) grams.

At trial, the defense attorney did not object to the admission of the drugs seized from [Appellant] (Exhibit 1) or the photograph of those drugs taken shortly after they were discovered. (Exhibit 1A). Moreover, the Commonwealth offered the envelope used to transport the drugs as Exhibit 5. There was no objection from the defense to the admission of Exhibit 5. Moreover, the conclusions rendered by Forensic Technician Llinas about the contents of Exhibit 1 were set forth in a report marked as Exhibit 4. The defense lodged no objection to the admissibility of Exhibit 4.

At trial, [Appellant] did not contest his own possession of heroin. In his testimony, [Appellant] admitted that he used ten (10) to fifteen (15) bags of heroin each day. [Appellant] did not deny that the substance found on his person was in fact heroin. Rather, [he] argued that all of the heroin he possessed was for personal use rather than for delivery or sale to others.

Trial Court Opinion, 10/2/20, at 2-4 (record citations omitted). Following trial, the jury found Appellant guilty of PWID, possession of a controlled substance,

possession of drug paraphernalia, and false identification to law enforcement.[3] On May 27, 2020, the trial court sentenced Appellant to an aggregate term of 60 to 120 months' imprisonment. Appellant filed post-sentence motions, which the trial court denied on October 2, 2020. Appellant appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant argues that the Commonwealth failed to meet "its burden to establish the so-called 'chain of custody.'"[4] Appellant's Brief at 4 (unnecessary capitalizations omitted). In support, Appellant claims that the chain of custody report lists Detective Minnick, instead of Detective Mong, as the officer who initially collected and placed the drugs into evidence. *Id.* at 8. Appellant also claims that the report contains a singular reference to someone named "Rodriguez" who is not Appellant (or associated with Appellant). *Id.* at 9. Finally, Appellant points out that Detective Michael Dipalo accessed the seized evidence on May 21, 2019 for purposes of transporting the drugs to the Pennsylvania State Police Crime Laboratory ("PSP Lab"), but did not do so until the following day, May 22, 2019. *Id.*

---

[3] The trial court convicted Appellant of driving under suspension pursuant to 75 Pa.C.S.A. 1543(a).

[4] Appellant also argues that the trial court, in its October 2, 2020 opinion, failed to address fully his claim regarding "the deficiencies" in the chain of custody. *Id.* In specific, he points to the omission of Detective Mong's name from the chain of custody report and Detective Dipalo's checking out of the evidence a day prior to transporting and submitting it to the state police for purposes of testing. In light of our disposition herein, we need not separately address this claim.

- 4 -

At the outset, we note that Appellant's claim that the Commonwealth failed to establish the chain of custody is not preserved for our review. As we explained in **Commonwealth v. Russell**, 209 A.3d 419 (Pa. Super. 2019), **appeal denied**, 218 A.3d 862 (Pa. 2019):

> In order to preserve a claim for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court, or the claim is waived. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. The princip[al] rationale underlying the waiver rule is that when an error is pointed out to the trial court, the court then has an opportunity to correct the error. By specifically objecting to any obvious error, the trial court can quickly and easily correct the problem and prevent the need for a new trial. Additionally, the appellate court should not be required to waste judicial resources correcting a problem that the trial court could have easily corrected if it had been given the opportunity to avoid the necessity of granting a new trial.

**Russell**, 209 A.3d at 429 (citations and quotation omitted); **see Commonwealth v. Baumhammers**, 960 A.2d 59, 73 (Pa. 2008) (to preserve issue for appellate purposes, party must make timely and specific objection to ensure trial court has opportunity to correct alleged error); **Keffer v. Bob Nolan's Auto Service, Inc.**, 59 A.3d 621, 645 (Pa. Super. 2012) ("one must object to errors, improprieties or irregularities **at the earliest possible stage** of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.") (citations omitted) (emphasis added); **see also** Pa.R.E. 103(a) (providing that an "[e]rror may not be predicated upon a

ruling that admits or excludes evidence unless . . . a timely objection . . . appears of record.").

Here, upon reviewing the record, we are constrained to agree with the trial court that Appellant failed to lodge a timely objection to the Commonwealth's alleged failure to establish chain of custody. Although Appellant generally alluded to some concerns about this issue at trial, he failed to make a timely and specific objection to any exhibit introduced into evidence or the chain of custody report when he questioned the Commonwealth's witnesses.[5] Regardless, even if this issue were not waived, Appellant still would not be entitled to relief.

"[C]hain-of-custody is an evidentiary principle that refers to the manner in which evidence was maintained from the time it was collected to its submission at trial." **In re D.Y.**, 34 A.3d 177, 185 (Pa. Super. 2011) (citations omitted), **appeal denied**, 47 A.3d 848 (Pa. 2012). It is well-settled that "any issue regarding gaps in the chain of custody relate to the weight of the evidence, not its admissibility."[6] **Commonwealth v. Witmayer**, 144 A.3d

---

[5] Appellant also did not move for a mistrial on this issue.

[6] Our standard of review relating to claims implicating weight of the evidence is as follows.

> On this issue, our role is not to consider the underlying question of whether the verdict was against the weight of the evidence. Rather, we are to decide if the trial court palpably abused its discretion when ruling on the weight claim. When doing so, we keep in mind that the initial determination regarding the weight of the evidence was for the factfinder. The factfinder was free to

*(Footnote Continued Next Page)*

939, 950 (Pa. Super. 2016), *appeal denied*, 169 A.3d 27 (Pa. 2017); *accord*

*Commonwealth v. Copenhefer*, 719 A.2d 242, 256 (Pa. 1998). Although

the Commonwealth "bears the burden of demonstrating some reasonable

connection between the proffered exhibits and the true evidence,"

*Commonwealth v. Pedano*, 405 A.2d 525, 528 (Pa. Super. 1979), it need

not "establish the sanctity of its exhibits beyond a moral certainty."

*Commonwealth v. Bennett*, 827 A.2d 469, 481 (Pa. Super. 2003), *appeal*

*denied*, 847 A.2d 1277 (Pa. 2004). Thus, "[a] complete chain of custody is

not required so long as the Commonwealth's evidence, direct and

circumstantial, establishes a reasonable inference that the identity and

condition of the exhibits have remained the same from the time they were

first received until the time of trial." *Commonwealth v. Alarie*, 547 A.2d

1252, 1255 (Pa. Super. 1988) (citation omitted), *appeal denied*, 557 A.2d

720 (Pa. 1989). Put differently, "[t]he Commonwealth must only create a

reasonable inference that the chain of custody was not broken in order to

introduce the evidence in question." *Id.* Additionally, the Commonwealth

---

believe all, some or none of the evidence. Additionally, a court
must not reverse a verdict based on a weight claim unless that
verdict was so contrary to the evidence as to shock one's sense of
justice.

*Commonwealth v. Habay*, 934 A.2d 732, 736-37 (Pa. Super. 2007)
(internal citations omitted), *appeal denied*, 954 A.2d 575 (Pa. 2008). "[A]
trial court's denial of a post-sentence motion 'based on a weight of the
evidence claim is the least assailable of its rulings.'" *Commonwealth v.*
*Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012) (quoting *Commonwealth v.*
*Diggs*, 949 A.2d 873, 880 (Pa. 2008)).

"need not produce every individual who came into contact with an item of evidence, nor must it eliminate every hypothetical possibility of tampering." *Commonwealth v. Cugaini*, 452 A.2d 1064, 1065 (Pa. Super. 1982) (citation omitted).

Here, based upon our review of the record, the Commonwealth presented sufficient evidence from which the jury reasonably inferred that the chain of custody was not broken in this case. At trial, the Commonwealth presented the testimony of Detective Mong, who testified, among other things, that after they recovered heroin from Appellant's person, they packaged it in a Ziplock bag that was then put in a manilla envelope, which then was "placed in a temporary storage locker until it's packaged and sent to the [PSP Lab]." N.T. Trial, 12/17/19, at 35. Describing the process of securing evidence, Detective Mong testified that the evidence is "entered into the system [] by another officer that worked in the Drug Task Force . . . and then it would be packaged and sent to the [PSP Lab] after it was entered through like a BEAST evidence logging system." *Id.* "After it's photographed there will be evidence tape placed on it. It will be signed and dated by the officer that finished packing it up." *Id.* Detecting Mong explained that the process was in place to ensure that when the evidence reaches the PSP Lab, "it's in the same condition it was when you recovered it." *Id.* at 35-36. Detective Mong testified that it was [Detective] Dipalo who would "typically transport" the evidence to the PSP Lab and he did so in this case. *Id.* at 36. He further testified that Exhibit 1 (the seized drugs) was in "the same condition" at the

time of trial as when it was recovered from Appellant, except for the PSP evidence tape. *Id.*

On cross-examination, Detective Mong clarified that after he placed the drugs recovered from Appellant in a manilla envelope, he transported the envelope to the Drug Task Force office where he placed it in an evidence locker. *Id.* at 53-54. Detective Mong also stated that Detective Minnick prepared the chain of custody report in this case by entering information in the BEAST system. *Id.* at 55. When asked if he knew why the name "Rodriguez" appeared in the report, Detective Mong answered "no." *Id.* at 56. Detective Mong testified that, prior to trial, the last time he handled the evidence was when he "placed [it] in the evidence locker to be packaged" for transportation to the PSP Lab. *Id.* at 58.

On re-direct, Detective Mong testified that after the evidence recovered in this case was placed into an evidence locker, Detective Minnich entered the information into the evidence system, as indicated on the chain of custody report. *Id.* at 59. According to Detective Mong, to the extent the report references one "Rodriguez" as possessing the narcotics recovered from Appellant, the reference was "an error." *Id.* at 60. The chain of custody report clearly lists Appellant in all relevant places except one, where it mentions "Rodriguez." *Id.*

The Commonwealth also presented the testimony of Detective Minnick, who explained the BEAST evidence system. *Id.* at 65.

> It's our evidence system that we maintain in our office that logs our custody of the evidence, what the descriptions are item by item. Whenever I do that I normally separate it out by drugs versus evidentiary items versus forfeiture items. And then I complete a separate website documentation form for the state police that will be forwarded to the state police for their analysis at their laboratory.

*Id.* He testified that he entered the evidence into the BEAST system in this case in accord with his duties. *Id.* Detective Minnick further explained that even though Detective Mong collected the evidence, ultimately it was he [Detective Minnick] "who enters it into the system, prepares it to be sent for lab testing." *Id.* at 66. Detective Minnick testified that the chain of custody report erroneously references "Rodriguez" under evidence item D2. *Id.* at 69. According to Detective Minnick, when he entered the information in the BEAST system, he committed a typographical error. *Id.* at 69, 71. "That was a typo. When I do this, I have multiple cases that I'm working on at one time. A Rodriguez was a subject involved in a separate [case] I was processing evidence for that same day." *Id.* at 69. According to Detective Minnick, even though he may work on multiple cases at the same time, he handles evidence only for one case at a time. *Id.* at 69-70. Thus, each case is handled individually and evidence from one case is repackaged and resealed before evidence from a different case is removed from the locker. *Id.* at 70. Detective Minnick maintained that evidence in this case was not co-mingled with evidence from another case. *Id.* at 71, 80.

On cross-examination, Detective Minnick explained that the chain of custody report lists his name as the individual who initially collected the

evidence in this case, even though that individual should have been Detective Mong. *Id.* at 77.

> I'm the one that – whenever you open up the software to enter the evidence into the software I'm the one that opens it and does all of that, so it automatically defaults to my name. So in this circumstance I did not deselect my name to put Detective Mong's name[.]

*Id.* Detective Minnick clarified that the reports lists his name because he was the person who created it. *Id.* at 78.

Appellant called to the stand Detective Dipalo, who testified that he was the "evidence custodian for the Lebanon County Detective Borough [(sic)] and the Lebanon County Drug Task Force." *Id.* at 125-26. Detective Dipalo testified that he transported the seized evidence (heroin) in this case to the PSP Lab. *Id.* at 126. He indicated that he logged out and processed the evidence on May 21, 2019, and "probably delivered" it to the PSP Lab on the following day. *Id.* at 127. When asked whether it "would be normal course of events, to check it out and take it to the lab the next day", Detective Dipalo answered "[y]es, I usually ready the evidence to go the day before." *Id.*

On cross-examination, Detective Dipalo stated that the evidence containing the drugs was opened twice. *Id.* at 129. "There w[ere] two seals on the envelope. There was the original seal from Detective Minnich. There

was a blue seal across the bottom from the [PSP Lab] when they took the items out.[7]" ***Id.***

Given the foregoing, the jury was well within its powers to conclude that Detective Mong initially collected and secured the evidence, even though his name did not appear on the chain of custody report, which was created by Detective Minnick. To the extent the report identified Detective Minnick, instead of Detective Mong, as the individual who initially collected and secured the evidence, it can be explained by the software's default settings. Moreover, the jury believed the Commonwealth's evidence that the name "Rodriguez" was listed on the report in error.[8] As the trial court noted, it was a "typographical error." Trial Court Opinion, 10/2/20, at 9. Finally, the jury believed Detective Dipalo's testimony that it was normal for him to check out evidence the day prior to transporting the same to the PSP Lab. Thus, the jury reasonably inferred from the Commonwealth's evidence that the chain of custody was not broken in this case and we may not substitute our judgment

---

[7] Detective Dipalo suggested that the envelope was opened and sealed a third time when the police examined its contents following its return from the PSP Lab. N.T. Trial, 12/17/19, at 129.

[8] Appellant seemingly admits

These deficiencies are explained that the system auto-generates Detective Minnick's name, even if he is not the person entering the system; that the entry of Rodriguez as the person from whom the heroin was collected, was a typo as a result of Detective Minnick working multiple cases, one of which involved Rodriguez, who was a subject involved in a separate matter.

Appellant's Brief at 9.

for that of the jury. *See **Commonwealth v. DeJesus***, 860 A.2d 102, 107 (Pa. 2004) (noting we may not substitute our judgment for that of the factfinder—whether a jury or the trial court—because it is the province of the factfinder to assess the credibility of the witnesses and evidence); ***Commonwealth v. Johnson***, 668 A.2d 97, 101 (Pa. 1995) ("an appellate court is barred from substituting its judgment for that of the finder of fact."); ***Commonwealth v. Forbes***, 867 A.2d 1268, 1273 (Pa. Super. 2005) (stating that "[t]he weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. An appellate court cannot substitute its judgment for that for the finder of fact."). Accordingly, Appellant does not obtain relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/10/2021

- 13 -